Thank you, your honors. Good afternoon, and may it please the court. My name is Nancy Olson. I represent the United States. In this case, Mr. Mora-Alcaraz agreed to shield his son from a sensitive conversation. And when he did so, the district court erred in granting suppression here because that brief consensual separation did not rise to the level of a restraint that was commensurate with a formal arrest. Mr. Counsel, I have three kids, and you briefly segregate my kid to another area out of my sight. And I'm going to be concerned, especially if it's, you know, officers that show up in armed uniforms and vehicles, and who knows if the lights were on on those vehicles. But moving my child away, any second away from my child would be concerning. So isn't that part of the problem here? I agree that it's concerning, your honor, and I think there are two points with respect to what you raised. One is that they asked Mr. Mora-Alcaraz, so imagine if someone came to you and said, hey, I need to ask you about this. Do you mind if we step over here a little bit to talk about it so your kids don't hear? And then you say yes, so that's the first distinction. That isn't actually what he said his reason was. But I asked to speak with the defendant away from the minor child. Why? It's procedure to separate witnesses. As far as our policy's procedures, I didn't know if it was appropriate to discuss that besides policy with a potential witness or victim while talking to the defendant. So it wasn't because he was trying to protect the child. Your honor, page in the record, though, if I may direct you to page 80 of the record. He said I asked if we could speak out of earshot of his son and he agreed without reservation. So there's two different parts. There's sort of a department policy and procedure reason that he's saying this is standard police department policy and I'm kind of just doing my job. But secondly, we're looking more about what a reasonable person in this situation would feel. And so that goes to what Mr. Mora-Alcaraz would feel. If I say I want to ask you about this incident last night, do you want to talk to me about it? Do you mind if we do it outside of earshot of your son? And again, that's page 80. And then he agrees without reservation. And there's also some testimony. They asked for his identification. I wasn't clear from the record whether or not they gave him his identification back. Your honor, there's no evidence in the record that they took his identification. This is at page 113 in the record. It's clear that Officer Jackins asked to see it and he mentioned it was a Nevada ID card. And then the defense asked, well, you retained it throughout, didn't you? Something to that effect. And the testimony was, I don't recall. So it would be speculating to say that he ever took the ID because all he remembered doing was looking at it. So I don't think the record provides a basis either way on that. But certainly just looking at an ID is not enough to provide pressure in the situation when he's just confirming that this person is who he thinks is speaking to him. And then, Judge Mendoza, if I can go back to the first question that you asked. The other point I wanted to make regarding the separation from the child, you had said out of eyesight. But the record makes clear that for nearly the entire duration of this conversation, they were in eyesight. And that's at two places in the record. I would direct you to page 98 and also page 146. So there's two different officers. There's the one talking to Mr. Moore-Alcarez. And then there's the set that are standing in the breezeway with the little boy. And they both independently of each other describe the situation. Maybe I misunderstood or misremembered the record because I thought it was he was behind some doors that were closed. And when they closed, he couldn't see them. But maybe I misread the record. Your Honor, the way that I read that was like the glass doors on a mall. So it's double doors and when they open and close automatically so people can go in. And instead of just having those double doors open and then you're in the store, the first set opens and there's sort of a little foyer or a breezeway. And then there's a second set of doors that actually lead you into the mall, into the store. And so the way the officers described it, the ones who were standing with the little boy, talked about being in the breezeway but not in the store. And then there was some information that at the end when Moral Acres had gone over to his truck, that there might have been a brief moment at the end when they were right inside of the Dick's Sporting Goods because the wife did testify that she saw them in front of the cash registers, mostly in front of the door. But it appears to be that that was the case at the very end of the encounter. Her thought and view was that, in fact, he had wanted to leave with the child he couldn't have because they were there to do a welfare check on the child. And in fact, that part I read you before about how the child was a witness, suggested that they wanted to talk separately to the child. So it doesn't appear that he could have just said, I'm going to leave with the child. That's right, Your Honor. And I don't think that the test would be whether or not he would feel free to abandon the child. There's no case that says... You're saying that he could be free to leave by himself and not with the child. No, because the question would be, right, would he be comfortable to end the conversation with the officer and walk back over to his son? Not would he feel free to run off to his truck and leave his son. No one's suggesting that he would abandon his son. That's clearly not the relationship that he had with his son. He cares about him. He's not going to leave him there. He has to be free to leave with his son. You're agreeing that he wouldn't be free to leave with his son. No, I would direct the court to the Cazares case. It's to end the encounter. So, for example, if he's just talking to the officer and they're by his truck and he wants to go back over by Dick's Sporting Goods, there's a separate question of whether, let's say, Child Protective Services had come or something like that. You mean that being free to leave doesn't include being free to leave them all? He has to stay there even if he's in custody. No, it doesn't, but that's two separate questions. The first step, does he feel free to end the conversation and walk away from the officer? And that's what this turns on. And then separately, is he going to leave the ball? Of course he's not. He's going to go back to his son and then say, OK, are we done here? Then the mom comes.  Isn't he in custody just to be asked to stay in the mall? Even if he could end the conversation, but he can't leave the mall. That's not in custody? Yes, if that were the case, that would be true. But no one's saying he can't leave the mall. The question for custody is the circumstances surrounding the conversation with the officer. Does he feel free to end the conversation and walk away? It's a separate question of whether, for a different reason, for example, child protective services or the mom comes for some other reason, whether he would leave the mall with or without his son. But that's a separate question of whether he feels like he can tell the officer, OK, I'm done talking to you. I'm going to walk away and go back over to my son. So nobody had said to him. The officer has the son, has custody of the son. Isn't that right? So there are cases that recognize that if the officers separate the individual from a family member, that that is tantamount to being in custody. So are you suggesting that he could have said, I want to take my son and leave? I don't think that's it. I'm suggesting he could have said he wanted to end the conversation and go back over to where his son is. And it is a separate question of whether he could have left because of the other domestic reasons. But, Your Honor, Judge Schroeder, you're right about the other cases. But, for example, take a look at Kim, where, in that case, the woman walked up to the store. They unlocked the door, let her in, shut the door right behind her, locked it and shoved her husband out and physically separated him that way. I think the difference here is he was not taken away. The little boy wasn't in custody. They were standing by with him because, going back to where we started, this argument. But your argument amounts to the child was in custody because you couldn't simply take him away. So that's in custody. Your Honor, if Mr. Mora-Alcaraz is going to have a private conversation with the officer, they can't just abandon the little boy. So the other officers are babysitting him. And there's nothing in the record. But then you said, the judge said, my understanding is he could not have simply taken the child. And you're now agreeing with that. He could not have simply taken the child. So the child, let's let alone whether the defendant was in custody, the child was in custody. Because he couldn't be with his parents. Your Honor, I believe the child was being babysat during this private conversation. And the problem with focusing on whether or not something that was going to happen later, the mom coming or child protective services coming, that's subjective to this case. You have to look at the objective circumstances around the conversation with the officer. And that would be taking him back to the side. That goes back to the very strange test for custody, which is whether he would have been, would have been, free to leave. There's no obligation to say you're free to leave, apparently, although it's relevant whether he said it. So you're being predictive and you are looking at the future and a counterfactual fact. So therefore, it seems that part of the counterfactual facts that's relevant is, could he have left with his child? And you're saying no. So to that degree, either the child's in custody or he's in custody because he can't leave with the child. Your Honor, I see my time's up, but I'll just answer the question if I'm able to. I don't think it's whether he, you don't use the counterfactual subjectively here. It's whether he felt he was free to leave objectively. So I think it's still focusing on that encounter and whether he felt that he could stop answering questions, not the subsequent subjective events that would have happened specifically here, because he has no information to believe he can't walk back over to his son. Is it standard whether he felt he could stop answering questions? Because that's why you have a Miranda warning. The felony could stop answering questions. I thought the question was whether he was in custody, whether he could leave, not whether he could stop answering questions. To walk away. Right. Right. I'm sorry. I was using him interchangeably. To say I would like to stop answering questions, I'm going to walk back over to my son now. So yes, hand in hand, I would agree with you on that. Thank you very much. Thank you. Thank you. Thank you, Your Honor. Good afternoon and may it please the court. Erin Kevorkian on behalf of the appellee, Mr. Julian, Julian Mora Algaraz. So if I may, I'd like to begin right where the government left off in this discussion of custody. And I think it's important at this juncture to come take a step back and remember all of the circumstances that the district court discussed in this case. When coming to its ultimate custodial determination here. So, of course, as the court today has been discussing, it was a crucial fact that Mr. Mora Algaraz had been separated from his son. And I think it's also important to remember here, we had the initial separation. But that degree of separation gradually increases as the encounter goes on. So first it's out of earshot. And then it's a little bit farther away distance wise. He's never asked if his son can be taken further away. And then it's behind this first set of doors. And at some point it's beyond a second set of doors. But beyond the isolation from his son, the district court also considered whether it was a police dominated atmosphere and went through some of the more relevant Craighead factors here. So the district court considered, first of all, the number of officers that were at the scene that day. So it was four officers to one Mr. Mora Algaraz. The district court considered that the officers were uniformed. The district court considered that the officers were armed. The district court considered that they were in marked police cars, at least one of which had its lights flashing. I know during the district court proceedings there was a discrepancy between whether the lights were red or whether they were amber. But the district court clarified and said the light, you know, regardless of the color of the lights, it's what a reasonable person would have perceived that to be. And ultimately the lights were flashing there. The district court also recognized that Mr. Mora Algaraz was never informed of his right to either stop speaking to the officers at the time or again of his right to leave the encounter. And I think as both this court has suggested previously and the Supreme Court has suggested previously often, this is perhaps one of the most important factors in determining what a reasonable person would have done in this situation. And on that point, your honors, I think that's really the crux of this case here is what would a reasonable person have believed himself able to do in this situation? And quite simply at bottom, isolated from his young son in a police dominated atmosphere, unaware of his rights in this situation, the government simply can't demonstrate on this record and didn't before the district court and can't on review now. That Mr. Mora Algaraz was anything other than in custody in this situation for a second. And the Miranda warning could have been provided. That doesn't require suppression, though, of the physical evidence, does it? On this record, it does, your honor. Yes, your honors. So on this record, so we have custody and we have Miranda, assuming those two and going forward. We also know on this record and the government agrees that Mr. Mora Algaraz was never informed of his right to decline consent. So there's three of the factors that for this court's consideration. The other two remaining factors on this record are simply unknown. So we don't know whether all officers refrain from manipulating their weapons. We do know that they were all armed. We don't know whether they all refrain from manipulating their weapons. And we also don't know whether or not Mr. Mora Algaraz was actually threatened or even informed of the possibility of obtaining. We don't know these things. This court can get back so that the district court judge sort of flushes out all of those issues and looks at this from a totalitarian. Sorry, from the total circumstances here. No, your honor. And the reason for that is simple is it was the government's burden to demonstrate voluntary consent on this record. And this court is held in the reverse scenario. So on appeal under clear air standard on looking whether to affirm a finding of voluntary consent. This court has stated that it won't do so without having at least several of the factors present in order to affirm here. Of course, the government has an even harder road to travel because we affirmatively have at least three factors finding in favor of the district courts. Involuntary supporting the district courts. Involuntary consent finding. So even if the government were to introduce evidence on the remaining two factors, it simply wouldn't tip the balance in this case. But I would also note for the court on this point that the district court came to this decision after an evidentiary hearing that spanned two days. So both parties had a full and fair opportunity to present the evidence that they thought was relevant to this question. And on this record, this record is more than ample for this court to affirm. And again, we're under clear air review here. So in order for this court to send it back on on clear error, it wouldn't just be a substitution of this court sitting in the first instance saying that it may or may not disagree with the district court judge. This court must have a firm and definite conviction that a mistake has been committed here. And with three of the. If you just look at the time surrounding the consent to search the truck. He seemed pretty voluntary. Where is the gun tells where a gun is. Can I look for a sure. And so on, given the keys. So what is the. So the Miranda warnings custody then become all important. That right. In other words, what are the factors that you think. Approval with regards to the consent. Well, Your Honor, I think that we have the custody. We have lack of Miranda. And we have lack of informing Mr. That he had the right to decline consent. And I would further note for your honor that that and I think this is something the district court recognized in its order as well. An individual's cooperation, especially in the atmosphere in which this occurred. His mere cooperation or his acquiescence to officers requests. Does not meet the government's burden to show that voluntary consent was given to show that consent was given of a free and intelligently and of a free and rational will. Do they have to provide, do they have to tell the individual that they can decline consent. No, Your Honor, law enforcement officers are not obliged to tell an individual that. And again, under the totality of the circumstances, it's just one more thing for this, excuse me, one more factor for this court's consideration. And so looking at this in the totality and looking at it specifically in a, in a, in a voluntariness context. It's one more circumstance that tells this court, just as it told the district court that Mr. Didn't voluntarily make this determination with a full understanding of the various of his various rights or, or abilities within the circumstances. So again, in the district court's oral opinion, or in his motion to reconsideration, does he discuss the consent to search the truck? I believe it's ER 42. That's not the oral opinion. Oh, I can't see. Yes, Your Honor. So it's at ER 242. In order on ER 4 and another one. You know, I apologize, Your Honor. I was in the second. So there's the full hearing transcript was in the second volume. And I see Your Honor first volume. If you give me a moment here. I can tell Your Honor in the first, in the first volume, it's at ER 19. And so that's what we have here. We have the district court making the finding where we have the district court making a finding of no Miranda, no Miranda warnings being provided. We have the custodial finding that was just determined. We have no consent in this record. And on this particular record, I'd submit to the court that the government simply can't discharge this burden, especially under a clear error review to demonstrate a firm and definite conviction that any error has been made with regard to the voluntary consent finding. I see that I'm close to, I'm close to my time here. And I would certainly rest on the remainder of the arguments made in the briefing. The district court didn't in terms apply the separate standards for a search consent. Is that right? I apologize, Your Honor. District court did not separately apply the standards for a consensual. Seems to regard the custody issue as fairly as disposable independently disposable. I think even though the district court didn't didn't again set out the separate standard, I think it's clear here on this record that that's what the district court was applying. The district court went through a very thorough analysis here on custody and Miranda and various other rights that Mr. Mr. More Alcaraz wasn't provided during this encounter. And I would lastly note for the court, if I may just briefly, we would Mr. More Alcaraz's argument concerning rule for his applicability, following the rules, enabling that. And for that reason, the merits and the government's waiver, we actually asked this court to dismiss. But it seems to be. Right. A bar, a bar respectfully didn't grapple with this particular issue. A bar is simply don't know whether on a type of motion for reconsideration, whether there was an exception to Healy's rule. Mr. More Alcaraz does not argue that there is an exception to Healy's. But rather that Healy's rule is simply now been displaced as a whole. So for those reasons, we'd first ask that this court dismiss. But in the alternative, we'd ask that this court affirm on the merits. Thank you. Honors. I'll just briefly address the voluntary consent issue. The district court did make a factual finding that this consent was very voluntary to search the truck. However, as judge was pointing out, there was a legal error that followed that the court found the lack of Miranda dispositive and said, because of that, we're done here. So there was no separate voluntary consent analysis. But even if the court adopts Mr. More Alcaraz's position that the other analysis and findings by the court were sufficient. Then we would ask this court to uphold that very voluntariness finding, which was at page 19 of the record as discussed. Because it is a separate issue. And even if the court finds that he was in custody and should have received his Miranda warnings. This court has also found, as we discussed in our brief, that a person in custody has the ability to voluntarily consent to the search. And so looking at the totality of the standard of review is somewhat different. That's right. The standard of review for voluntariness to consent is clear error. The standard of review for voluntariness about statements is de novo. So when we're talking about the truck and retrieving the gun, that's clear error. And the court found that that was very voluntary. However, then kind of went off. Page 19. Yes, that's where the consent was very voluntary. But because of the lack of Miranda, we would never know. But that's a legal error because, as the court discussed earlier, lack of Miranda is not dispositive. It is a multi-factor test. And I will point out that we do know from the record the three officers. Well, why wouldn't we send it back to let the judge figure that out and figure it out and apply, one, the correct standard and apply the correct factors that need to be analyzed? You could certainly do that, Your Honor. We do think there's a finding there. And if the court was basing that voluntariness finding on its whole analysis, this court could affirm and say it's not clearly erroneous. Because, as counsel pointed out, the court heard from many witnesses. It was a long evidentiary hearing and could affirm on that basis. But if the court wanted factor-by-factor analysis from the district court on the voluntary consent issue specifically, then the court could certainly remand on that issue. I see I'm well over my time. On the healing dispensation, I mean, honestly, it seems to me that the defendant has the better of the argument with regard to what we read the statute and the more recent cases you would think the law was. There is no exception for the government motion to reconsider. There are some exceptions for defending. We're not exceptions. But you say that it's different because it determines when finality is. But that's exactly what the provisions for are directed at. The FRAP for which has in civil cases has similar civil part of it has similar. So it's very odd that there's this. Meaning this one off. Action off rule. Action to what's otherwise a very rigid system. Well, Your Honor, the two times the Supreme Court has considered this, not the direct question, but whether something was untimely after reconsideration motion, the court said it was fine and kept the rule in place. And remember, this is after the statute was amended to say liberally. And so even if the court has a question on it under Supreme Court doctrine, this is something that the Supreme Court would need to reverse itself on based on us seeing the Supreme Court upholding timely appeals after reconsideration. Then we would ask the court to follow that rule as it's still in place now. Not only in statute, but a policy. Everybody else has to follow the actual rules that are written down. I understand. I understand you're you're you're you're starting to size this problem in terms of observing. I think why isn't there a rather indefensible anomaly? It's not a anomaly, I don't think, Your Honor, or a special treatment for the government, because what we're talking about is the effect of a reconsideration motion when such a motion would have an effect on a particular appeal. The reason why the government is unique in this situation is because there's a statute when the government gets to take certain interlocutory appeals, which is not the case, for example, always in civil cases where, as you mentioned, there is that clear rule about the effect of a motion for reconsideration. So it's more about when the government's allowed to take these interlocutory appeals and then applying that same rule about the effect of reconsideration, rendering the order non-final and letting the district court have the first crack to hopefully save resources and make the record as complete as possible before it makes its way to this court. The defendant and the parties in a civil case and so on, but they don't get they only get to do what's written down and the government gets to do this thing that's not written down. But I understand your position. So thank you both. Thank you, Your Honors. United States versus Mara Alcoranza submitted without a United States.
judges: Schroeder, Berzon, Mendoza